UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

LESLIE B. PRESLEY,                              )
                                               )
    Plaintiff,                            )
                                               )
    v.                                    )        Case No. 1:11-cv-327
                                               )        (Mattice/Carter)
MICHAEL J. ASTRUE,                             )
COMMISSIONER OF                                )
SOCIAL SECURITY,                               )
                                               )
    Defendant                             )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial

review of the final decision of the Commissioner denying the plaintiff a period of disability,

disability insurance benefits, and supplemental security income under Title II and Title XVI of the

Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of plaintiff's Motion for Judgment on the Pleadings (Doc. 13) and defendant's Motion

for Summary Judgment (Doc. 15).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

## Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 46 years old at the time of the ALJ's decision (Tr. 24, 40).   She obtained a GED

and previously worked as a receiving clerk, walking and standing eight to ten hours per day and

1

lifting 50-pound boxes (Tr. 40, 124-25, 129, 136-37). Plaintiff alleged she was disabled due to fibromyalgia, panic attacks, and depression (Tr. 31-38, 123).

<u>Application For Benefits-Administrative Proceedings</u>

Plaintiff filed an application for a period of disability and Disability Insurance Benefits (DIB) on October 21, 2008, alleging disability beginning May 1, 2008 (Tr. 103-06). Plaintiff's application was denied initially and on reconsideration (Tr. 50-56, 61-65). Plaintiff requested a hearing before an administrative law judge (ALJ), which was held on December 20, 2010 (Tr. 66-67, 26-47). On December 30, 2010, the ALJ issued a decision denying Plaintiff's application (Tr. 9-25). The Appeals Council denied Plaintiff's Request for Review (Tr. 1-8), making the ALJ's decision the final decision of the Commissioner. Plaintiff has exhausted her administrative remedies, and this case is now ripe for review under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

<u>Standard of Review</u>

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial

evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes a zone of choice within which the decision makers can go either way without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

How Disability Benefits are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

Step 2: Does claimant have a "severe" impairment or combination of impairments that significantly limits claimant's ability to do basic work activities, and will foreseeably result in

3

death or last at least twelve months?   If not, claimant is not disabled.   20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

Step 3:   Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1?   If so, the claimant is disabled, and the analysis may end without inquiry into the vocational factors.   20 C.F.R. § 404.1520(d).   If inquiry is made into vocational factors, after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4:   Does claimant's RFC permit claimant to perform claimant's past relevant work?   If so, the claimant is not disabled.   20 C.F.R. § 404.1520(f).

Step 5:   Does the claimant retain the RFC to perform other work in the economy?   If so, the claimant is not disabled.   20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability.   *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999).   Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC.   *Id.*

<u>ALJ's Findings</u>

The ALJ concluded at step five of the sequential analysis that Plaintiff was not disabled because jobs exist in significant numbers in the national economy that the Plaintiff can perform (Tr. 20).   The ALJ made the following findings in support of the decision, which are conclusive if they are supported by substantial evidence in the record:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

4

2. The claimant has not engaged in substantial gainful activity since May 1, 2008, the alleged onset date.

3. The claimant has the following severe impairments: fibromyalgia, lumbar spondylosis/lumbar facet syndrome, depressive disorder not otherwise specified, and panic disorder without agoraphobia.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant would require a sit/stand option after at least thirty minute intervals; unskilled job tasks; infrequent contact with the general public and coworkers; and a stable work environment with little change over time.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 31, 1964 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2008, through the date of this decision.

(Tr. 14-20)(citations omitted).

<u>Issues Presented</u>

Plaintiff argues the ALJ's decision should be remanded for a new hearing and decision because the Decision does not provide relevant reasons, grounded in the record, showing why the ALJ did not fully credit Plaintiff's allegations (Doc. 14, Plaintiff's Memorandum at page 22). She complains the assessment by the ALJ of her subjective complaints is not supported by substantial evidence for the following reasons:

A. Correct standards for credibility were not followed.

B. Dr. Sienknecht's comments were not grounds for discrediting Plaintiff's allegations.

C. Lack of restrictions by Plaintiff's treating physicians was not probative evidence.

D. Lack of treatment was not probative to Plaintiff's credibility because she could not afford treatment.

E. The consultative report of Dr. Holland was irrelevant, and

F. Daily Activities were mischaracterized and were not probative of an ability to work.

For reasons that follow, I do not agree.

<u>Plaintiff's Testimony</u>

On an October 28, 2008 Pain Questionnaire, Plaintiff reported she experienced pain in her back, hips, neck, shoulders, and legs.   She indicated the pain began March 31, 2008.   Medicine only relieved her pain moderately, and it would make her sleepy (Tr. 131). She reported she could not stand for fifteen minutes at a time, and that walking, sitting, driving, and lifting also caused

pain. Accordingly, she performed as few activities as possible. "Some mornings my daughter has to get me out of bed. She also does errands for me and takes me where I need to go." (Tr. 132).

In a Function Report dated October 31, 2008, Plaintiff indicated she could no longer stand and walk for long periods, sew, or lift her grandchildren. (Tr. 146). Her daughter Brandy drove and did what Plaintiff could no longer do: "I do what I can and my daughter does the rest." (Tr. 146, 148). The length of the shopping trip depended on her pain level that day. (Tr. 148). She stopped quilting and attending church when she got sick. (Tr. 149). Difficulty with memory and concentration ("Like I'm in a fog") caused her problems reading and maintaining conversations. (Tr. 150). Although Plaintiff no longer cooked full meals, Plaintiff did prepare sandwiches and would go shopping once a month, (Tr. 147-48), and Brandy would take Plaintiff to the park to "try to exercise" twice a week. (Tr. 149).

Plaintiff repeated many of these same limitations at her January 20, 2009, interview with consultative examiner Steven Cartwright. She stated that her daughter had to help her out of bed about three times a week and sometimes had to help with dressing and bathing. Plaintiff no longer lifted the laundry basket, and she took breaks when she tried to sweep the floor. If she shopped, she would have to sit down before she was half way through the store. When asked if she prepared meals, she responded "sometimes." She stopped going to church because she could not sit comfortably in the pews. She stopped quilting and was contemplating selling her sewing machine. She did sometimes play videogames to escape, but she did not expound on what type of videogames, for how long she played, or how well she performed (Tr. 278).

Dr. Mazzolini, on August 20, 2008, recorded that Plaintiff complained she had difficulty standing out of a chair after any period of exercise. (Tr. 204). On February 4, 2009, Plaintiff told Dr. Sienknecht that she had had diffuse pain since she was in her 20s and that the pain had gotten debilitating over the past couple of years. He recorded that she "has had such severe pain and fatigue she is not really driving anymore." (Tr. 287). In the patient form she completed for that appointment, she indicated she was unable to cook or run errands and she had "much difficulty" in the following areas: dressing oneself completely; getting in and out of bed or chairs; walking outdoors; washing and drying her entire body; reaching overhead, picking up clothes; driving or getting in and out of the car; and vacuuming and doing chores. (Tr. 288). Plaintiff filled out the same form at her next appointment on May 6, 2009. (Tr. 347). She again told Dr. Sienknecht that activity usually aggravated her symptoms and that she was experiencing spasms and cramps in addition to her pain, fatigue, and shakiness. (Tr. 345).

At the hearing, Plaintiff testified that she experienced fatigue, stiffness, spasms, cramps, fogginess, and "just all-over body pain." (Tr. 31-32). She had good days in which she could do things like sweep the floor, attend a Christmas pageant, or go to her consultative examination, but she rested before and after these events. (Tr. 33-34). She could wash dishes for about five minutes but needed to rest in a chair before finishing. (Tr. 37). She drove every once in a while but only the mile to her daughter's house on a country road, which was her "safety zone." (Tr. 38). Her concentration could be good enough to allow her to read on some days, but some days it was not. (Tr. 39).

She testified she had panic attacks, but it took a few days for them to build up. (Tr. 34-35). She had far fewer panic attacks when she stopped going to work and remained in her safety zone (Tr. 34). When she does have an attack, she relies upon family to help her calm down (Tr. 35).

<u>Relevant Medical Evidence</u>

On May 10, 2007, one year before the alleged onset date, Plaintiff was seen by her family practitioner, Dr. J. Michael Mazzolini, M.D., after having a panic attack at work that day (Tr. 207). Plaintiff related various stressors, including her son's recent deployment to Afghanistan and being the sole breadwinner in the family due to her husband having multiple sclerosis (Tr. 207). She reported being on a 50mg dose of Trazodone at bedtime for fibromyalgia which made her drowsy for 15 hours or more, and Dr. Mazzolini recommended she take Celexa daily and Alprazolam as needed (Tr. 207).

On October 18, 2007, Plaintiff presented to Skyridge Medical Center complaining of an anxiety attack (Tr. 191-93, 196-202). She described her symptoms as moderate in intensity, she was in no respiratory distress, her heart had a regular rate and rhythm, and she was alert and fully oriented (Tr. 192). Plaintiff reported that she smoked two packs of cigarettes per day (Tr. 192, 196). Dr. Charlie Fang, M.D. diagnosed acute anxiety and panic disorder (Tr. 193). Approximately an hour after receiving a one milligram dose of Ativan orally and 30 minutes after receiving an intramuscular dose of two milligrams of Ativan, Plaintiff reported her symptoms had improved (Tr. 191-93, 197). She was given a prescription for Xanax, counseled to quit smoking, and was discharged (Tr. 193, 197, 199, 201).

9

The following day, Plaintiff reported to Dr. Mazzolini that she had been seen in the hospital for a panic attack and reported that she ceased taking Celexa because it made her feel bad. She had not followed up with Dr. Mazzolini first (Tr. 207). She also reported the Alprazolam worked but made her feel drowsy (Tr. 207). Dr. Mazzolini prescribed Paroxetine, an antidepressant, as preventative care for anxiety attacks (Tr. 207). The record reflects that Plaintiff next saw Dr. Mazzolini on April 8, 2008, with a complaint of a small cyst on her right earlobe (Tr. 206). Her medications were listed as Cymbalta and Xanax (Tr. 206). At a follow up appointment for the cyst on April 15, Plaintiff reported to Dr. Mazzolini that she had been seeing a Dr. Kavin Johnson for her anxiety, who had prescribed Cymbalta, on which Dr. Mazzolini noted she had "stabilized," and she had been "working and functioning fairly well" (Tr. 206). On July 28, 2008, Plaintiff complained of sinus problems and reported that she had been out of work since May for "back problems," but she had not had any panic attacks and was taking Cymbalta only one or two times per month (Tr. 205). Plaintiff returned to Dr. Mazzolini's office on August 20, 2008, and she indicated that she had been receiving treatment from a chiropractor and experienced pain, muscle spasms, stiffness, and paresthesias in her right leg (Tr. 204). She was only taking Cymbalta intermittently due to the cost (Tr. 204). Physical examination revealed negative straight leg raise testing, intact reflexes, adequate strength, and no muscle twitching (Tr. 204). Dr. Mazzolini noted that Plaintiff had previously been diagnosed with fibromyalgia, but had no surgically-addressable lesions on her imaging studies. He referred Plaintiff to a Dr. Sienknecht, and prescribed a new medication and a dose of Trazodone

that was half the dose with which Plaintiff reported daytime drowsiness (Tr. 204).

The record reflects that on May 1, 2008, Plaintiff established care at Cleveland Medical & Back Pain Clinic (Tr. 271-274). She reported that on March 31, 2008, she could not move upon waking and called in to work April 1, though she had been back to work unloading trucks at some time before the appointment (Tr. 274). Plaintiff described lower back and hip pain. An examination by Anita E. Bayles, a nurse practitioner, revealed a full range of motion in Plaintiff's neck, smooth gait and balance, and pain on palpation and on movement of the lumbar spine and SI joints. Subsequent examination findings were similar (Tr. 209-71). Ms. Bayles ordered an x-ray and a back brace to be worn at all times except when sleeping to stabilize Plaintiff's lumbar spine (Tr. 271-72). An MRI performed May 20, 2008, indicated small disc protrusions at L3-L4 and L4-L5 with minimal mass-effect at L3-L4 and mild central canal stenosis at L4-L5, though no significant foraminal stenosis (Tr. 248). On May 5 and 15, June 2, July 7, and December 22, 2008, Plaintiff underwent diagnostic lumbar medial branch blocks (Tr. 209-11, 221-22, 258-59, 268-69). Plaintiff reported feeling "at least 50% improved" after her first procedure, that her pain level was usually at ten on a one to ten scale in the morning but "decrease[d] during the day with light activity to a 5" on June 2, and that her mobility had improved on July 7 (Tr. 221, 238, 258). A Family and Medical Leave Act form signed by a chiropractor, but completed in another person's handwriting, appears in records from Cleveland Medical & Back Pain Clinic and indicates that Plaintiff, whose condition began on April 30, 2008, should be able to return to work on June 1, 2008 (Tr. 229-30, 275). A person whose

11

signature is illegible, presumably Plaintiff's chiropractor, signed multiple forms dated from May to September of 2008 indicating that Plaintiff was under his care and that he recommended Plaintiff be excused from work "to avoid aggravation of a health condition" (Tr. 218, 220, 228, 233, 236, 240, 250, 257, 261, 267).          On February 4, 2009, Plaintiff saw Dr. Charles W. Sienknecht, M.D. of Arthritis Associates, as recommended by Dr. Mazzolini, for a second opinion regarding her fibromyalgia diagnosis (Tr. 286-93).    Plaintiff reported pain "from head to toe, all day and all night," with no time of day being worse, and that multiple NSAIDs had been ineffective but Cymbalta helped (Tr. 287).    Physical examination demonstrated a normal range of motion in all joints, normal and symmetrical muscle strength in all extremities, multiple soft tissue trigger points, negative straight leg raise tests, intact sensation, and a normal gait (Tr. 286).    Dr. Sienknecht diagnosed fibromyalgia, degenerative spondylosis of the lumbar spine, and smoking addiction (Tr. 286).    He stressed that Plaintiff's fatigue and pain could be improved to provide a better quality of life but not completely resolved (Tr. 286).    Dr. Sienknecht recommended low-impact exercise and advised Plaintiff to return in three months (Tr. 286).    On May 6, 2009, Dr. Sienknecht "stressed that [fibromyalgia] did not damage nerves or muscles or joints and it was usually not considered to be disabling" (Tr. 346).    Plaintiff was a "no show" for her September 2009 appointment and did not respond to subsequent attempts to contact her on October 21, 2009 and October 26, 2009 (Tr. 346).

Plaintiff presented at Skyridge Medical Center on May 28, 2009, and complained of a foreign body in her eye (Tr. 334-42).    Plaintiff reported she was outside doing yard work when debris fell in her eye (Tr. 338).    Treatment notes indicate she was in no acute distress, had no

motor or sensory deficits, ambulated independently, and could perform all activities of daily living without assistance (Tr. 336, 339).

On January 23, 2009, Dr. William A. Holland, M.D. examined Plaintiff at the request of the state agency (Tr. 282-84). She reported a history of fibromyalgia and ambulated "throughout the clinic in a slow deliberate manner," "slightly stooped or flexed in the lumbar area and hold[ing] her hand on her lower back," but she was able to sit and rise from a seated position easily and get on and off the examination table unassisted (Tr. 283). Physical examination revealed a normal range of motion in all extremities, full grip strength, negative straight leg raise tests, flexion to 90 degrees in the lumbar spine, lumbar extension and lateral flexion to thirty degrees, no spasm, intact motor sensory, and normal station and gait, including tandem and heel/toe walking (Tr. 283). Dr. Holland opined that Plaintiff had no physical limitations (Tr. 284).

Dr. Denise P. Bell, M.D. and Dr. Nathaniel D. Robinson, M.D., agency reviewing medical consultants, completed Physical RFC forms on February 23, 2009, and May 18, 2009, respectively (Tr. 312-20, 325-33). Both doctors opined Plaintiff could perform a full range of work at the medium exertional level (Tr. 312-20, 325-33).

Analysis

A. Credibility:

For reasons that follow, I conclude the ALJ's credibility assessment is supported by substantial evidence. The ALJ found that Plaintiff experienced a number of medically determinable

13

impairments that were "severe" for purposes of Social Security disability benefits, including

fibromyalgia, lumbar spondylosis/lumbar facet syndrome, depressive disorder not otherwise

specified, and panic disorder without agoraphobia (Tr. 14).

With fibromyalgia, objective laboratory and clinical testing is of limited value in assessing the

severity and resulting functional impact of certain of Plaintiff's impairments such as chronic fatigue.

*See Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996).   Fibromyalgia, or fibrositis as it is also

referred to, presents unique challenges to the ALJ and the Commissioner because there are no

objective medical tests which can assess the severity of the disease or even its very existence.   The

Sixth Circuit has discussed this issue in *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir.

2007). In *Rogers*, the Court again recognized that fibromyalgia can be a severe impairment and that,

unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present

no objectively alarming signs. 486 F.3d at 234 (citing *Preston*, 854 F.2d at 820).

However, the fact that several physicians assess disabling restrictions does not mean that an

ALJ cannot reject those opinions if there are other opinions and evidence which contradict the

disabling opinions and lead to the conclusion Plaintiff does not have disabling restrictions.   In

*Jordan v. Comm'r of Soc. Sec.*, the Sixth Circuit found substantial evidence existed to support the

rejection of the opinions of seven physicians who concluded a plaintiff was completely unable to

work, because of conflicting evidence from two consulting physicians, both of whom concluded

plaintiff was exaggerating her symptoms and on the basis of video evidence which contradicted

plaintiff's claims of disability.   No. 07-5876, 2008 WL 4977339, *2, 5 (6th Cir. Nov. 25, 2008)

(vacated and remanded on other grounds). In this case, as the ALJ noted, none of Plaintiff's treating or examining physicians assessed that she was disabled.

In this case the ALJ found Plaintiff's fibromyalgia was a severe impairment that would cause work-related limitations (Tr. 14-19). However, the mere diagnosis of an individual as a person experiencing such conditions does not entitle them to a finding of disability; they must prove that the condition imposes symptoms and functional limitations of sufficient severity as to prevent them from working. *Vance v. Comm'r of Soc. Sec.*, No. 07-5793, 2008 WL 162942, at *4 (6th Cir. Jan. 15, 2008) (citing *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether (claimant is one of the minority.") (citations omitted); *see also Rose v. Hartford Fin. Servs. Grp.*, No. 07-5423, 2008 WL 648965, at *8-9 (6th Cir. Mar. 11, 2008) (citing as persuasive and quoting *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003): "While the diagnos[i]s of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such [illness] do lend themselves to objective analysis."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

Here the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but concluded Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 19). The ALJ then enumerated specific, and I consider adequate, reasons supporting this finding.

The medical records, as discussed by the ALJ, do not support Plaintiff's allegations of disabling physical limitations and instead provide substantial evidence to support the ALJ's

finding that Plaintiff was capable of a restricted range of sedentary work (Tr. 16-19). Although

Plaintiff reported she experienced weakness and muscle spasms in her legs (Tr. 32), Dr. Mazzolini,

Plaintiff's general practitioner, noted on August 20, 2008, that she had adequate strength and no

muscle twitching (Tr. 204). On May 1, 2008, the day Plaintiff testified she "clocked in and . . .

tried to work and . . . hit the floor and . . . couldn't" (Tr. 30), Ms. Bayles, a nurse practitioner, noted

she had pain on palpation and movement of her lumbar spine and SI joints, but she had a full range

of motion in her neck and smooth gait and balance (Tr. 271). In February of 2009, Dr.

Sienknecht's examination of Plaintiff revealed a normal range of motion in all joints, normal and

symmetrical muscle strength in all extremities, multiple soft tissue trigger points, negative straight

leg raise tests, intact sensation, and a normal gait (Tr. 286). Dr. Holland indicated on January 23,

2009, that Plaintiff had a normal range of motion in all extremities, full grip strength, negative

straight leg raise tests, flexion to 90 degrees in the lumbar spine, lumbar extension and lateral

flexion to thirty degrees, no muscle spasms, intact motor sensory, and a normal station and gait,

including tandem and heel/toe walking (Tr. 283). On May 28, 2009, Plaintiff was in no acute

distress, had no motor or sensory deficits, ambulated independently, and could perform all

activities of daily living without assistance (Tr. 336, 339). I agree with the Commissioner that

these minimal findings do not support Plaintiff's contention that she could not perform even a

limited range of sedentary work. As the Commissioner argues, muscle atrophy and signs of

neurological defects are typically associated with severe pain. *See Jones v. Sec'y of Health and*

*Human Serv's.,* 945 F.2d 1365, 1369-70 (6th Cir.1991) (stating reliable evidence of pain includes

medical evidence of muscle atrophy, reduced joint motion, muscle spasm, and sensory and motor

disruption); *Blacha v. Sec'y of Health and Human Serv's.*, 927 F.2d 228, 231 (6th Cir.1990) (noting muscle atrophy is typically associated with severe pain); *Mullen v. Bowen*, 800 F.2d 535, 547-48 (6th Cir.1986).

B.   Dr. Sienknecht's Comments:

Plaintiff argues the ALJ erred in citing Dr. Sienknecht's failure to assign restrictions as a factor weighing against Plaintiff's credibility for there was no need to offer restrictions because "a person with fibromyalgia is not at risk of causing serious harm by over-doing it, as Dr. Sienknecht explained in the last treatment note." (Doc 14, Plaintiff.'s Brief at 20).   Dr. Sienknecht wrote:

"Again I discussed the diagnosis of fibromyalgia with her [Plaintiff] and her daughter.   I stressed that this was a difficult chronic condition that we could sometimes improve with certain pain medications but that it was not reasonable for this to resolve.   On the other hand I stressed that it did not damage nerves or muscles or joints and it was usually not considered to be disabling" (Tr. 346).

Dr. Sienknecht did not discuss restrictions, but noted that the condition did not damage the tissues of the body and, significantly, that "it was usually not considered to be disabling," with no indication that Plaintiff's case was an exception to the general rule (Tr. 346).   The ALJ also noted Dr. Mazzolini noted no restrictions on Plaintiff's activity, and no acceptable medical source opined Plaintiff had ongoing physical limitations arising from her fibromyalgia or other conditions (Tr. 17, 19), which weighs directly on the key question in this case: the severity of Plaintiff's symptoms.   *See Kalmbach v. Comm'r of Social Sec.,* No. 09–2076, 2011 WL 63602, at *10 (6th Cir. Jan. 7, 2011) (stating, "disability claims related to fibromyalgia are related to the symptoms

associated with the condition—including complaints of pain, stiffness, fatigue, and inability to concentrate—rather than the underlying condition itself."); *Vance*, 2008 WL 162942, at *5 (stating, "the contested issue is the severity of the symptoms," not merely the existence of condition). Dr. Sienknecht's recommendation that Plaintiff engage in low-impact exercises was not accompanied by any mention of work-related limitations or restrictions (Tr. 286). In fact, the only physicians who specifically opined that Plaintiff had any limitations on her physical functioning indicated that Plaintiff was capable of performing work at the medium level of exertion (Tr. 312-20, 325-33). Drs. Bell and Robinson, who reviewed the evidence of record, issued opinions that Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently and stand or walk and sit for six hours in an eight-hour day (Tr. 312-20, 325-33). The ALJ did not base his entire reasoning on Dr. Sienknecht's failure to specify restrictions. However, I conclude it was not error to consider their absence.

C. Lack of Restrictions from the Treating Physician:

Plaintiff argues lack of restrictions by Plaintiff's treating physicians is not probative evidence. The ALJ did point out that none of Plaintiff's treating or examining sources opined that she was disabled (Tr. 16-19), and that her physicians never restricted her activity (Tr. 183-297, 334-48). As a panel of Sixth Circuit Judges has stated, "a lack of physical restrictions constitutes substantial evidence for a finding of non-disability." *See Longworth v. Comm'r of Soc. Sec.,* 402 F.3d 591, 596 (6th Cir. 2005 ) (quoting *Maher v. Sec'y of Health and Human Servs.,* 898 F.2d 1106, 1109 (6th Cir. 1989)).

D. Lack of Treatment:

Notwithstanding Plaintiff's argument to the contrary, I conclude the ALJ properly noted Plaintiff's lack of treatment as additional evidence that Plaintiff's condition was not as limiting as she claimed. *See* 20 C.F.R. §§ 404.1527(d)(4); 404.1529(c)(3)(v); *Blacha*, 927 F.2d at 231 (claimant's failure to seek treatment and use of only mild medication undercut complaints of disabling pain); *see also Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995) (noting that ALJ was entitled to draw an inference adverse to claimant from general lack of medical care); *Barrett v. Shalala*, 38 F.3d 1019, 1023-24 (8th Cir. 1994) (finding that claimant's minimal treatment was inconsistent with his claims of disabling pain); *Rowe v. Astrue*, No. 08-24-HRW, 2008 WL 4890228, at *3 (E.D. Ky. Nov. 7, 2008) ("With regard to Plaintiff's symptoms, the record reveals mostly conservative treatment as well as trigger point injections for her fibromyalgia"). Plaintiff was treated conservatively for her fibromyalgia and disc disease symptoms, and treatment notes indicate the conservative measures were helpful (Tr. 221, 238, 258, 287). Also, as the ALJ noted, Plaintiff did not consistently seek treatment for fibromyalgia or other impairments (Tr. 19). Despite her claims of disabling pain, Plaintiff sought medical treatment on only three occasions in 2009, the last being in May (Tr. 286-93, 334-48), and there is no indication that she received any further treatment, but instead was a "no show" for an appointment with Dr. Sienknecht and did not return his office's calls (Tr. 183-348).

Plaintiff testified that her doctors recommended Hydrocodone and Oxycontin to treat her pain symptoms (Tr. 36), but treatment records do not indicate that Plaintiff's doctors discussed these or other pain medications with Plaintiff (Tr. 183-348). Plaintiff stated she declined prescriptions for pain medication because she was afraid of developing an addiction and she feared

that neighbors would break into her home, presumably to steal her medications (Tr. 36). However, as the Commissioner notes, there was no evidence Plaintiff had been addicted to medication in the past, had experienced a break-in, or discussed her concerns with her doctors. *Cf. Pannell v. Apfel*, 141 F.3d 1185, 1998 WL 104740, at *2 (10th Cir. 1998) (table) (holding ALJ properly rejected Plaintiff's testimony regarding fear of addiction to pain medication when "[n]othing indicate[d] that she discussed medication addiction or side effects with any of her doctors"). The record reflects only one instance of Plaintiff refusing a prescription for pain medication, on May 28, 2009, when she suffered a superficial abrasion of her right cornea while doing yard work, at which time she declined a prescription, stating, "I've got pain meds at home" (Tr. 336). As the Commissioner argues, if Plaintiff truly experienced pain to such a degree that it caused her to "scream," scaring her grandson at night (Tr. 33-34), it would be reasonable to expect Plaintiff would seek more extensive treatment. *See Strong v. Soc. Sec. Admin.*, No. 02-5604, 2004 WL 232242, at *4 (6th Cir. Feb. 3, 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain.").

As Plaintiff notes (Doc. 14, Plaintiff's Brief, p. 21), a failure to seek treatment for a period of time may be a factor to be considered against a claimant unless she simply has no way to afford or obtain treatment to remedy her condition. *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990); *Hale v. Sec'y of Health and Human Servs.,* 816 F.2d 1078, 1082 (6th Cir. 1987). Plaintiff did testify she had trouble affording some medications due to a lack of insurance, but she did not provide any

evidence that she attempted to access free or subsidized medical services at a hospital or clinic and was denied such access.   *Cf. Boothe v. Comm'r of Soc. Sec.,* No. 1:06-CV-00784, 2008 WL 281621, at *12-13 (S.D. Ohio Jan. 31, 2008) (finding no ALJ error where record was devoid of evidence that claimant tried to obtain low-cost medical care despite claimant's argument that his failure to seek any treatment whatsoever for a period of one and one-half years was due to lack of funds).   During the period in which Plaintiff did not have health insurance, she had appointments with Dr. Mazzolini and Dr. Sienknecht, and she sought emergency medical treatment when debris fell in her eye and caused a superficial corneal abrasion (Tr. 287, 291, 334-42), which suggests she had access to some resources to pay for medical treatment.   It is reasonable to conclude that if Plaintiff's condition was as limiting as she claimed, she would have sought some treatment for her complaints in the eighteen months between her last visit to a doctor and the ALJ's decision.   As the Commissioner argues, the ALJ did not deny benefits based upon a failure to follow prescribed treatment or rely solely on Plaintiff's lack of treatment, but noted her failure to seek treatment as one factor in assessing her credibility (Tr. 16-19).

E.   Dr. Holland's Report:

Dr. Holland, who actually examined Plaintiff, found no limitations on Plaintiff's abilities (Tr. 17).   Although Plaintiff argues this report should be irrelevant, I conclude the ALJ could properly consider it in assessing the severity of Plaintiff's limitations.   Although the ALJ did not give any significant weight to the consulting opinions and "generously limited" Plaintiff's RFC to a reduced range of sedentary work (Tr. 17), these opinions support the ALJ's credibility determination.   *See* 20 C.F.R. § 404.1527(e)(2).

21

F. Daily Activities:

Finally, Plaintiff argues the ALJ mischaracterized Plaintiff's daily activities and argues her activities are not probative of her ability to work (Doc. 14, Plaintiff's brief pp. 17-19). Plaintiff concedes that an ALJ may consider household and social activities in evaluating Plaintiff's subjective complaints, *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007), but argues the Plaintiff in *Cruse* could perform daily activities without any problems. She further argues the ALJ must explain why a claimant's minor activities show that the claimant is capable of performing substantial gainful activity and explain why Plaintiff's minor life activities (as depicted in the Decision) demonstrate that she is capable of maintaining any full-time job on a consistent basis without excessive breaks or absences.

The ALJ can properly consider Plaintiff's activities in assessing the credibility of her complaints (Tr. 16-19). Although not dispositive, a Plaintiff's activities may show that her symptoms are not as limiting as alleged, and Social Security regulations specifically state that activities are a factor to be considered. *See* 20 C.F.R. § 404.1529; *Walters v. Commissioner of Social Security*, 127 F.3d at 525, 532 (6th Cir. 1997); *Blacha v. Secretary of Health and Human Servs.*, 927 F.2d 228 at 231 (6th Cir. 1990). Plaintiff argues that her activities are not "comparable to typical work activities." However, the ALJ determined Plaintiff's activities were inconsistent with her allegedly disabling symptoms and the medical evidence of record (Tr. 19), not that she could perform them without pain. Other evidence also indicates Plaintiff was capable of activities around the house. On the last occasion on which she received medical care, hospital personnel did not indicate any

symptoms or problems related to Plaintiff's fibromyalgia, but did note that Plaintiff was injured while doing yard work (Tr. 334-42).

The ALJ noted in his opinion (referring to the Consultative Report of Stephen Cartwright, MS) that Plaintiff "reported that three out of five days, her daughter has to help her get out of bed, bathe, and dress," but that she "did report that she does attempt general household routines such as sweeping" and "reported cooking, grocery shopping, watching television and playing video games" (Tr. 15-19, 278). The ALJ obviously considered this allegation but simply did not find support for that degree of limitation.

In any event, I conclude the ALJ did not rely solely on Plaintiff's activities in making his credibility determination but considered the record as a whole. In making these decisions, the ALJ considers, among other things, whether there are any inconsistencies between the claimant's statements and the rest of the evidence, including, but not limited to, medical signs and laboratory findings, physicians' statements, and the claimant's activities. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions should be highly regarded. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). If there is substantial evidence to support the Commissioner's findings, they must be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative

decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts.   I conclude there is substantial evidence to support the conclusion the ALJ reached in this case.

Conclusion

For the reasons stated herein, I RECOMMEND that the Commissioner's decision be AFFIRMED.   I further RECOMMEND that the defendant's Motion for Summary Judgment (Doc. 15) be GRANTED, the plaintiff's Motion for Judgment on the Pleadings (Doc. 13) be DENIED, and this case be DISMISSED. [1]

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[1]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.   Failure to file objections within the time specified waives the right to appeal the District Court's order.   *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.   *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).   Only specific objections are reserved for appellate review.   *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).